

**SO ORDERED.**

**SIGNED this 12 day of January, 2007.**

_____
**ROBERT E. NUGENT**
**UNITED STATES CHIEF BANKRUPTCY JUDGE**
_____


IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| MARK JOSEPH SCHWAIGER, | ) | Case No. 05-16267 |
| SUSAN DENISE SCHWAIGER, | ) | Chapter 7 |
| | ) | |
| Debtors. | ) | |
| | ) | |
| SHERYLE L. SCHWAIGER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Adv. No. 05-5769 |
| | ) | |
| MARK JOSEPH SCHWAIGER, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

Plaintiff Sheryle Schwaiger, now known as Sheryle Lynne Sheets, former wife of debtor

1

Mark Schwaiger, filed this complaint under 11 U.S.C. § 523(a)(15)[1] to except from Mark's discharge his marital property settlement obligation to pay her $400 per month for the rest of her life from his military pension as an equalization payment. Mark responds that, as a result of his straitened financial circumstances, Sheryle will be less burdened by discharging this obligation than he will be if he has to pay it. At trial, Sheryle appeared by her counsel Thomas Arnhold, and Mark appeared by his counsel Tish Morrical. Both parties also appeared in person, as did Mark's current wife and joint debtor, Susan Schwaiger. After hearing the evidence and reviewing the exhibits, the parties' stipulations of fact,[2] and trial briefs,[3] the Court is ready to rule.

Jurisdiction

The Court has jurisdiction of this core proceeding.[4]

Facts

Mark and Sheryle were divorced on August 16, 2001 pursuant to a Decree of Divorce out of the District Court of Ellsworth County, Kansas.[5] On that date, the parties entered into, and the district court approved, a Property Settlement Agreement ("Agreement") which was incorporated into the Decree of Divorce. Under that Agreement, Mark was obligated to pay to Sheryle $400 per

---

[1] The bankruptcy case in which this adversary proceeding is filed was commenced prior to October 17, 2005. Unless otherwise noted, all future statutory references are to the Bankruptcy Code, 11 U.S.C. §101, et seq. as it was in force prior to that date.

[2] Dkt. 25, Final Pretrial Order at 3-5.

[3] Dkt. 31 and 32.

[4] 28 U.S.C. §§ 157(b)(1), (b)(2)(I) and 1334(b).

[5] Plaintiff's Ex. 8.

2

month of his military pension for her life.[6] It appears that the Defense Finance and Accounting Service (DFAS) pays Mark the entire pension entitlement and that he, in turn, pays the $400 monthly obligation to Sheryle. The Property Settlement Agreement states "[h]e will be entitled to keep the military retirement but pay a the [sic] form of property division in the sum of . . . $400 a month . . . as long as Wife lives, even if she remarries or cohabits with somebody else."[7] The evidence is not entirely uniform on this point, however, because Exhibit 3 contains a check stub from DFAS for February of 2006 in the amount of $932, but with no supporting information. Exhibit 4 contains Mark's 1099-R from DFAS in the amount of $15,720 for 2005. Divided by 12, this indicates a monthly entitlement of $1,310. Thus it is likely that DFAS directly pays the $400 to Sheryle monthly.[8]

The Agreement also provides for Mark to have residential custody of the couple's minor child, Michael, who will turn 18 in August of 2007. With respect to child support, the Agreement provided that "[b]ecause of the substantial visitation and time spent with Wife, there will be no child support paid by Wife to Husband."[9] According to the evidence presented at trial, Sheryle pays Mark $212 per month in child support. This child support obligation appears to have started in June of 2005 upon the entry of an order on Mark's motion to increase child support and for contribution

---

[6] Both parties agree that Mark's military retirement also terminates upon his death.

[7] Plaintiff's Ex. 8, Exhibit A attachment.

[8] According to the Agreement the payment from Mark's military retirement was initially to be set up as a direct deposit to Sheryle. *See* Plaintiff's Ex. 8, Exhibit A at 3. The state court later referred to this payment as a "property equalization payment" which Mark was to make "via voluntary allotment directly from the Defense Financing Accounting System." *See* Plaintiff's Ex. 9 at 2, ¶ V.

[9] Plaintiff's Ex. 8, Exhibit A at 6.

3

to Michael's medical expenses.[10] Sheryle believes her child support obligation will end when Michael turns age 18.[11]

With respect to division of property under the Agreement, Sheryle was awarded a 1993 Mazda and all of her personal property. Mark was awarded a 1998 Sable, two real estate lots in Missouri, 401k retirement and stocks, and all of his personal property. The Court heard no evidence concerning what became of the vehicle awarded to Sheryle. According to Mark's bankruptcy schedules, the real estate is secured to Bennington State Bank. He apparently no longer owns the 1998 Sable as it is not listed in his bankruptcy schedules. Sheryle assumed two debts with Sears and Mark assumed the rest of the marital debts.

Neither the Decree of Divorce nor the Agreement made provision for an award of attorney fees to either party. No spousal maintenance was awarded to either party.

Mark has remarried and lives with his wife, Susan, and Michael, in a recreational vehicle (RV) that is situated on ground in a rural area owned by Susan's parents. They rent the RV and the ground from Susan's parents for $250 a month.[12] The RV has water and electric service. The family uses Susan's parents' telephone. There is no internet service, nor do the Schwaigers have a computer. They do have three vehicles, each of which is an older model and all of which appear to require maintenance budgeted at $250 per month. Michael, who was 17 at the time of trial, attends high school and hopes to attend community college upon graduation. He plans to live at home

---

[10] Plaintiff's Ex. 9.

[11] According to the Order entered 2005, the child support obligation would end when Michael graduated from high school. Plaintiff's Ex. 9.

[12] They live near Wells, Kansas which Mark testified is approximately 30 miles from his job at Exide in Salina.

4

during that time.

Mark and Susan commenced their chapter 7 bankruptcy on September 23, 2005. Reference is made in both the final pretrial order and the 2005 Order of the domestic court to Sheryle having also filed bankruptcy; the Court observes that Sheryle's chapter 7 bankruptcy was commenced in June 2004 after her divorce from Mark.[13] Sheryle listed no child support obligation to Mark in her Schedule J and listed no dependents in Schedule I.[14]

Mark's current income is difficult to ascertain. He is employed as a calibration coordinator at Exide and, according to his Exhibit A, receives net monthly compensation of $2,591. He also receives a military pension of $1,454 which, along with the $212 in child support, brings his monthly income to $4,257. If, however, one views only the check stubs in Exhibit 3, Mark earns less. Those checks include a weekly Exide check from February of 2006 in the net amount of $377 which converts to monthly pay of $1,634 (377 x 52 = $19,604. $19,604/12 = $1633.67). Per that same Exhibit 3, his DFAS payments are only $932 per month. With the child support, his total monthly net income calculated in this way equals $2,778. The stipulations of fact contained in the final pretrial order state that Mark's *gross* income from Exide from January 1, 2006 through February 5, 2006 was $4,384. Because Mark bears the burden of proof here, the Court will rely on his income estimate from Exhibit A, and find that his monthly net income as of the date of trial is $4,257. Due to progressive health problems and concerns, Susan is no longer employed and has not been employed since early 2005.

---

[13] *In re Sheryle Lynne Schwaiger*, Case No. 04-22410. Sheryle received her discharge on September 15, 2004 and the case was closed.

[14] Sheryle did list in Schedule J a $171 monthly payment for support of additional dependents not living with her.

5

Mark formerly worked as a salaried employee but when Exide went into Chapter 11, his job was changed and he now works as an hourly employee, calibrating scales and batteries, a job involving heavy lifting. Mark stated that he has suffered two heart attacks, one in December of 2004 and the other in July of 2005. At trial, he testified that he also has back, shoulder and arm injuries, perhaps as a result of his work. His budget indicates that the family spends about $250 per month on medical expense and an additional $125 per month on medications and supplements.

Susan has not worked for two years because she suffers from a number of ailments. She has been diagnosed with chronic fatigue syndrome, collapsed foot disorder, carpal tunnel syndrome, and most recently, with a tumor in her ear canal. According to her testimony, removal of this tumor may place her hearing and sense of balance at risk.[15] While Mark and Susan have many heath-related concerns, they have the good fortune of access to medical insurance under the "Tri-Care" program which is provided to military retirees and their dependents.[16]

Mark and Susan estimate their family's expenses per month at $4,042. Notable among these are their medical bills which amount to $250 per month plus "supplement" expense of $125 for items Susan takes to deal with her chronic fatigue. Also notable is the $250 car repair item which, taken annually, means that Mark and Susan expect to spend $3,000 a year maintaining their vehicles. While this seems high, the vehicles are old and Mark and Susan's ability to favorably finance newer cars may well be limited. They pay a debt to Susan's parents in the amount of $200 which,

---

[15] Without intending to cast doubt on the credibility of the health concerns of the various parties, the Court notes the absence of medical evidence in this trial, other than bills for prescriptions and professional consultation.

[16] Under the Agreement, Sheryle was to remain under this medical coverage. Plaintiff's Ex. 8, Ex. A at 3.

6

presumably, was discharged in their bankruptcy case. Their rent of $250 is very low and their other expenses do not seem unusually high, particularly when the Court considers that they live in a motor vehicle. After deducting their anticipated expenses, along with the $400 set over monthly to Sheryle, Mark and Susan have a surplus of $215 which, Susan testified, they "never see."

In terms of assets, Susan has a rollover retirement account in the approximate amount of $85,553.45. Mark has two 401k accounts, one on the Exide Salaried Employee plan in the amount of $14,049 and the other on the Exide Hourly Employee plan in the amount of $13,670. Exide has apparently been and may still be in Chapter 11 and the 401k accounts have been frozen. It was unclear from the testimony whether this means that Mark cannot draw upon them. He does continue to contribute $200 per month to the hourly account.

Sheryle's financial situation is also precarious. She works at an ALCO warehouse as an hourly employee. She unloads freight from trucks for $9.45 an hour and usually gets 5 hours of overtime every week. In determining Sheryle's income, the Court first looks at her Exhibit 5 in which she states that she receives net income of $1,664 monthly. The Court cannot deduce whether this amount includes the $400 she receives from Mark. Sheryle testified that she receives a net paycheck every two weeks of approximately $650. If the Court assumes 26 annual pay periods and divides her annual income based on the biweekly paycheck by 12, this yields a monthly net income from ALCO of $1,408 ($650 x 26 = $16,900. $16,900/12 = 1408.33). Adding Mark's $400 payment to her yields a monthly income of $1,808. The Court concludes that this is a better calculation of Sheryle's monthly income.

According to Sheryle's Exhibit 5, her monthly expenses amount to $1,216.50. This does not include any rent because Sheryle lives with her companion, Jim Ebel. He owns the house where

7

they live. Sheryle contributes to the household by paying for some utilities, gasoline, insurance, and food. She does not own a vehicle and rides to and from work with Jim. He also works at the ALCO warehouse and earns $13.55 per hour or about $28,000 a year. According to the testimony, Sheryle may actually have more expenses than are shown on the exhibit. For instance, she is responsible for a percentage (27%) of Michael's uninsured medical bills. She also has no allowance for any kind of savings, nor is there a firm agreement about what she is to contribute to Jim's household expenses. She also reported a cigarette expense of about $130 per month. Under the circumstances, the Court concludes that Sheryle's actual monthly expenses total approximately $1,347 per month, including the $212 she pays Mark as child support. She and her companion are not married and, as a result, Sheryle has no assurance of being able to remain in the house indefinitely. Jim pays all real estate taxes, the home mortgage payment, and other expenses associated with the house. When payment of Mark's $400 is considered, Sheryle has a monthly surplus of $461.

Sheryle testified that she has suffered some work-related injuries, but that she is able to continue to work. Her recent mammogram came back "positive" and will require follow-up to determine whether she may have breast cancer. She has some medical insurance, but no retirement through her employment.[17] Sheryle testified that she "could not make it" without the $400 stipend from Mark. Sheryle has very few assets. On exhibit 5 she listed some furnishings, a TV and VCR, and some miscellaneous household goods that she estimates to be worth $7,540.

When Michael reaches majority, Sheryle will not be required to pay the $212 child support. That will increase her surplus, before receiving the military pension payment, to $273. With the

---

[17] ALCO makes a retirement plan available to employees but Sheryle does not contribute to her employer's plan.

8

pension, she would have a surplus of $673. When Mark stops receiving the child support, his surplus will drop to $3.00 a month after making the payment to Sheryle. A comparison of the parties' respective income and expenses is shown below.

|  | **Mark** | **Sheryle** |
|---|---|---|
| **Income** | 4,257 | 1,808 |
| **Expense** | -4,042 | -1,347 |
| **Surplus** | 215 | 461 |
| **After 8/07 (no child support)** | -212 | +212 |
| **Surplus** | 3 | 673 |

If the Court were to allow Mark's obligation to be discharged, he would gain $400 a month in income and Sheryle would lose the same amount. The parties' respective income and expenses would be approximately as set out below:

|  | **Mark** | **Sheryle** |
|---|---|---|
| **Income** | 4,257 | 1,408 |
| **Expense** | -3,642 | -1,347 |
| **Surplus** | 615 | 61 |
| **After 8/07 (no child support)** | -212 | +212 |
| **Surplus** | 403 | 273 |

Analysis

Before applying the foregoing facts to the applicable law in deciding the merits of the § 523(a)(15) discharge exception, the Court will first address Sheryle's claim for attorney fees. No

prayer for attorney fees was made in Sheryle's adversary complaint but she does seek such relief in the final pretrial order and the parties have briefed the issue.[18] Sheryle does not provide the statutory authority under which she is entitled to recover her attorney's fees in this proceeding. In her trial brief, Sheryle suggests that because a domestic court may award attorney fees in a divorce case, she is entitled to an award in the current proceeding. The Court disagrees. No award of attorney fees was made to Sheryle in the Decree of Divorce or the Property Settlement Agreement. Nothing in the Bankruptcy Code authorizes an award of attorney fees to a party in this situation.[19] While costs may be awarded to a prevailing party, attorney fees are not the type of costs that may be assessed.[20] Sheryle's request for payment of her attorney's fees is DENIED. The Court now turns to the merits of the § 523(a)(15) exception.

In order to establish that Mark's property settlement obligation should be excepted from his discharge under § 523(a)(15), Sheryle must demonstrate that the payment is not one for support under § 523(a)(5). There is no assertion that this payment is non-dischargeable support.[21] The Court

---

[18] Dkt. 25 at 6-7, ¶ 8.

[19] *Cf.* 11 U.S.C. § 523(d) (limited circumstances where attorney fees may be awarded to a prevailing debtor in a § 523(a)(2) discharge proceeding). *See also Seimer v. Nangle (In re Nangle)*, 281 B.R. 654 (8th Cir. BAP 2002) (Attorney fees incurred by creditor in pursuing dischargeability complaint are generally not recoverable.)

[20] *See* Fed. R. Bankr. P. 7054; 28 U.S.C. § 1920; *Bishara v. O'Callaghan (In re O'Callaghan)*, 304 B.R. 887 (Bankr. M.D. Fla. 2003)(Allowable costs are limited to the categories set forth in § 1920.); *In re Nichols*, 221 B.R. 275 (Bankr. N.D. Okla. 1998) (Attorney fees are generally not available under Rule 7054 authorizing an allowance of costs to the prevailing party.).

[21] Sheryle made a brief argument in her trial brief that the $400 monthly obligation was in reality spousal maintenance but she neither pled the § 523(a)(5) exception in her complaint nor identified it as a theory in the final pretrial order. The Court therefore concludes that this discharge exception is not properly before the Court and this case deals solely with the § 523(a)(15) discharge exception.

10

concludes from the wording of the Property Settlement Agreement and the subsequent 2005 Order that the award of the military retirement payment was in the form of a property equalization payment and therefore subject to discharge under § 523(a)(15). With that finding, the burden shifts to Mark to demonstrate that either (a) he lacks the ability to make the payment from income "not reasonably necessary to be expended for the maintenance or support of the debtor or a dependent of the debtor;" *or* (b) that the benefits to him of discharging the debt would outweigh any "detrimental consequences" to Sheryle.[22] The appropriate time to apply the ability to pay and detriment tests is at the time of trial.[23]

At present, Mark is making the $400 monthly payment, eliminating § 523(a)(15)(A) as a basis for discharging this obligation. Courts refer to the disposable income test contained in § 1325(b)(2) to determine if the debtor has the ability to pay.[24] Mark's payment of the debt while maintaining, at least on paper, some surplus, suggests that he has the ability to pay. As set out above, even when the $212 child support payment from Sheryle ends in 2007, Mark will still have a surplus, albeit a meager one, after making the $400 payment.

Therefore, this Court must apply the balancing test set out in § 523(a)(15)(B) and weigh the consequences of a discharge or non-discharge of this obligation to each party. In so doing, the Court looks at a variety of factors including: (1) the respective income and expenses of the parties; (2) the number of dependents; and (3) the nature of the debt.[25]

---

[22] *See Johnson v. Johnson (In re Johnson)*, 212 B.R. 662, 666 (Bankr. D. Kan. 1997).

[23] *Id.* at 667.

[24] *Hill v. Hill (In re Hill)*, 184 B.R. 750, 755 (Bankr. N. D. Ill. 1995).

[25] *Johnson*, 212 B.R. at 667.

11

If the Court only considered the respective present income and expenses of the parties, a discharge would benefit Mark more than a denial of discharge would deter Sheryle. Once the child support payments end, Mark will "lose" $212 per month without a commensurate loss of child-related expense and be left with a $3 surplus compared to Sheryle's potential $673 surplus. When the Court considers what the the actual effect of the discharge might be, the numbers even out somewhat and, as noted in the second table, Mark would have a surplus exceeding that of Sheryle's.

But the Court must also consider the fact that both parties' circumstances are fragile. Both Mark and Sheryle are in questionable health. Both do jobs that involve physical labor. Neither has an assurance of continued employment and both are of at least early middle age. Mark's wife, Susan, is, to some degree, dependent, being in poor health and facing possible additional medical expense. But is Mark and Susan's situation worse that Sheryle's? She, too, has health concerns. In addition, Sheryle lives in a non-marital relationship that does not impose a legal obligation on her partner to afford her shelter or support. The Court assumes that she could be asked to leave at any time. Were that to happen, she would then be left without either a home or transportation. The Court also considers that the nature of this debt is an apportionment of a military pension, a lifetime benefit in which Sheryle would have shared had the parties remained married and one in which she presumably invested by supporting Mark during his time of service.[26]

The balance of property weighs in favor of Sheryle. Susan and Mark have some measure of financial security by virtue of their 401k and IRA accounts. Between them, their retirement

---

[26] The Court notes in this connection that, in 1995 when Mark retired from service, he could choose whether to take a lump sum payout of his retirement or payments over time. Had he taken the lump sum during his and Sheryle's marriage, she would have benefitted accordingly.

12

amounts to more than $115,000. Sheryle has nothing beyond the small share of Mark's retirement and a few thousand dollars worth of personal property. Even if Sheryle continues to receive the $400 monthly payment, it only extends for Mark's lifetime. These additional circumstances blunt the impact of the comparison of sheer numbers. In light of Mark and Susan's financial reserves, their assets, and their continuing access to over $1,000 a month from Mark's military pension, theirs is the better of two very difficult situations.

The Court has considered the possibility of granting a partial discharge of Mark's debt as alternatively urged by Mark's attorney. While some courts have been reluctant to address the partial discharge question,[27] there is some authority for granting a partial discharge of non-support divorce obligations under § 523(a)(15). The leading case appears to be *Graves v. Myrvang (In re Myrvang)*[28] out of the Ninth Circuit. There, the court agreed with the Sixth Circuit's stance in *Tennessee Student Assistance Corp. v. Hornsby (In re Hornsby)*,[29] a student loan case, that a court has equitable powers under § 105(a) to grant a partial discharge and rejected the "all or nothing" approach taken by some courts. Moreover, both the *Myrvang* and *Hornsby* courts conclude that a partial discharge of a separate debt is permissible, rejecting the approach of some courts that permit a discharge of a separate obligation (resulting in a partial discharge of the total debt comprised of

---

[27] *See Patterson v. Patterson (In re Patterson),* 132 F.3d 33 (Table), 1997 WL 745501 (6th Cir. 1997) (declining to address the partial discharge argument in a § 523(a)(15) case where the bankruptcy court found that the debtor had an ability to pay the debt over a reasonable period of time); *Jestice v. Jestice (In re Jestice)*, 168 Fed. Appx. 39, 2006 WL 305654 (6th Cir. 2006) (declining to address the issue of a partial discharge in § 523(a)(15) context where it was not presented in the bankruptcy court).

[28] 232 F.3d 1116 (9th Cir. 2000).

[29] 144 F.3d 433 (6th Cir. 1998) (debtors had 14 student loans).

13

multiple obligations) but not a partial discharge of a separate obligation.[30] Thus, where the divorce obligation consists of a single obligation as here, the court has discretion to discharge a portion of that obligation.

While the Tenth Circuit has not addressed the partial discharge issue in a § 523(a)(15) case, it has spoken on the partial discharge issue in the student loan setting. In *Alderete v. Educ. Credit Management Corp. (In re Alderete),*[31] the Tenth Circuit reversed the bankruptcy court's grant of a partial discharge of student loans (discharging all interest and penalties except for the principal balance of the loans) because it failed to find that the student loans created an undue hardship. While the Tenth Circuit seems to suggest that a court may exercise its equitable powers under § 105(a) to grant a partial discharge it can only do so when the terms of § 523(a)(8) are satisfied (*i.e.* an undue hardship is shown). The bankruptcy court erred in granting a partial discharge only because it had found that no undue hardship existed under the *Brunner* test. The Tenth Circuit left open the possibility of a partial discharge in an appropriate case.

As the Court reads *Alderete* then, it must first determine that the benefit of a partial discharge to Mark outweighs the detriment to Sheryle. The difficulty in applying a partial discharge is determining the tipping point – at what point does the benefit to Mark in discharging the obligation outweigh the detriment to Sheryle in not discharging the obligation. Stated differently, what portion of the $400 debt should be discharged that would confer a greater benefit upon Mark than the

---

[30] *See Greenwalt v. Greenwalt (In re Greenwalt)*, 200 B.R. 909 (Bankr. W.D. Wash. 1996) (Court examined separately each marital debt that debtor was obligated to pay under the divorce decree; debt to ex-wife's parents was discharged while debts to other creditors were not discharged.).

[31] 412 F.3d 1200 (10th Cir. 2005).

14

detriment caused to Sheryle. While it is not the intent of this Court to give Mark additional disposable income, the Court notes that once Sheryle's child support obligation ends in the very near future, he will be left with virtually no cushion or margin for error in meeting his monthly expenses. He will have a "surplus" of $3. Susan credibly testified that they never see a surplus at month's end now, suggesting to the Court that additional expenses eat into what little disposable income they have left each month. The Court is especially mindful that neither party here lives a lavish lifestyle nor engages in unreasonable spending. A partial discharge of $200 of the monthly $400 debt, more closely levels the surplus each party is left with. Within eight months (when Sheryle's child support obligation ends) Sheryle's surplus will still be more than double Mark's surplus. She will have a surplus of $473 while Mark will enjoy a surplus of $203 (instead of $3 if none of the $400 debt were discharged). Applying a partial discharge of $200 to the first table above, yields the following results.

|  | **Mark** | **Sheryle** |
|---|---|---|
| **Income** | 4,257 | 1,608 |
| **Expense** | -3,842 | -1,347 |
| **Surplus** | 415 | 261 |
| **After 8/07 (no child support)** | -212 | +212 |
| **Surplus** | 203 | 473 |

Although this case is very close, for the forgoing reasons, Sheryle will bear the greater burden if Mark's $400 monthly debt is completely discharged. However, if only $200 of the $400 debt is discharged, the benefit to Mark outweighs the burden on Sheryle. Judgment should therefore be entered for Sheryle on her complaint excepting from discharge $200 of Mark's $400 monthly

15

obligation under the Property Settlement Agreement as set out above. A Judgment on Decision will issue this day.

# # #